**Michael P. McMULLEN, Appellant,**

**v.**

**Guy BELL, Administrator of the Public Employees' Retirement System, Appellee.**

No. S–11567.

Supreme Court of Alaska.

Jan. 27, 2006.

---

**42.** *In re Triem,* 929 P.2d at 650 (Compton, C.J.,     dissenting) (internal citation omitted).

Bradley D. Owens and Blair Marlowe Christensen, Jermain, Dunnagan and Owens, P.C., Anchorage, for Appellant.

Keith B. Levy and Virginia B. Ragle, Assistant Attorneys General, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

The Public Employees' Retirement System calculates an employee's retirement benefits based on the employee's average monthly compensation during his three best paid years. When, after thirty years working for the state, Michael McMullen retired, he sought to include substantial cashed-in leave as part of his compensation for purposes of calculating his retirement benefits. The Public Employees' Retirement Board denied McMullen's request. McMullen appeals, arguing that because the definition of "compensation" that was effective when he was hired did not exclude cashed-in leave, article XII, section 7 of the Alaska Constitution protects his right to include that leave when calculating his retirement benefits. Because McMullen was not eligible to cash in leave on July 1, 1977, when the legislature amended the definition of compensation to exclude cashed-in leave, we hold that he has no constitutionally protected vested right to include cashed-in leave as part of his compensation.

## II. FACTS AND PROCEEDINGS

Michael McMullen was hired by the Alaska Division of Personnel in September of 1969 and retired from state service in 1999. When he retired, he became entitled to retirement benefits under the Public Employees' Retirement System (the system). Under AS 39.35.370(c) & (d) and AS 39.35.680(4)(A), an employee who was hired before 1996 receives a percentage of his average monthly compensation for the three payroll years that yield the highest average, multiplied by his number of years of service. As a result, the higher the compensation for those three years, the greater the retirement

benefits that an employee will receive. McMullen's last three years of employment with the state were those for which he received the highest average monthly compensation.

During his last three years of employment with the state, McMullen cashed in substantial amounts of accrued leave. Before he retired, McMullen asked the Division of Retirement and Benefits (the division) to include the value of his cashed-in leave when it calculated his average monthly compensation for purposes of determining his retirement benefits.

The division informed him that it did not include leave cash-ins "as compensation for retirement calculation purposes for PERS members." In response, McMullen indicated that he believed that under this court's ruling in *Flisock v. State, Division of Retirement and Benefits*,[1] the division was required to include the cashed-in leave when calculating compensation. In *Flisock*, this court ruled that some members of the Teachers' Retirement System had a right under article XII, section 7 to include the value of their cash-ins in their base pay.[2]

The administrator of the system, Guy Bell, informed McMullen that, on the advice of the attorney general, the position of the division was that *Flisock* applied to members of the Teachers' Retirement System only and not to members of the Public Employees' Retirement System. Bell therefore denied McMullen's request.

McMullen appealed the administrator's decision to the Public Employees' Retirement Board. He argued that because cashed-in leave was not excluded from the definition of compensation when he was hired in 1969, he, like Peter Flisock, had a constitutionally protected right to include his cash-ins as part of his compensation. The board agreed and reversed the administrator's decision, ruling that *Flisock* required the division to include McMullen's cashed-in leave when calculating his retirement benefits.

The administrator appealed the board's decision to the superior court. The court observed that there were differences between the PERS and TRS statutes, that the actual practices of the systems were different, and that Flisock's expectations may well have been different from McMullen's expectations. It therefore remanded the case to the board for fact-finding on four questions:

(1) What exposure does [the system] have as a result of this decision?

(2) What was the practice of "cash-in" with respect to Mr. McMullen's category of employees prior to 1977?

(3) Did Mr. McMullen have a reasonable expectation of being able to "cash-in" leave prior to the 1977 amendment?

(4) Did the Legislature act immediately to exclude "cash-in" payments from compensation after reasonably learning of it?

The superior court specified that the board was "authorized to issue a new decision incorporating its new findings of fact on the four issues directed by the court."

After holding a hearing, the board issued findings addressing the court's questions. In response to the first question, the board found that under a worst case scenario, a ruling in McMullen's favor would cost the system thirty-six million dollars. The board found that, amortized over twenty-five years this might require an increase of .25% to the employers' contribution rates. The board found that the state of Alaska would, under the worst case scenario, need to pay an additional $1.28 million per year into the system's account.

As for the second question, the board observed that two collective bargaining units negotiated agreements that entitled them to cash in leave beginning in 1976. The board observed that shortly thereafter, "[a] legislative enactment ... amended the PERS definition of 'compensation' to specifically exclude cashed-in-leave" for purposes of calculating retirement benefits. The board found that McMullen was not a member of the collective bargaining units that negotiated the cash-in agreements and that there-

---

1. *Flisock v. State, Div. of Ret. & Benefits,* 818 P.2d 640 (Alaska 1991).

2. *Id.*

fore McMullen was not eligible to cash in leave before the legislature enacted the amendments excluding cash-ins from the definition of compensation.

In response to the third question, the board found that before 1977 McMullen had believed that it was possible that at some point he, too, might become eligible to cash in leave. But the board found that it was not until years later, when McMullen learned of the *Flisock* decision, that McMullen "linked the opportunity to obtain leave cash-in rights with inclusion into PERS compensation figures." The board therefore found that "McMullen had no expectations prior to July 1, 1977 of being able to include cashed-in-leave as a part of PERS compensation."

Finally, the board found that the legislature excluded cashed-in leave from the definition of compensation at the first legislative session following the collective bargaining agreements that authorized cash-ins.

Although all four participating members of the board agreed on the factual findings, they disagreed about their legal consequences.[3] Two members of the board concluded that the definition of compensation that was in effect in 1969 when McMullen was hired could not "be interpreted so broadly as to encompass hypothetical conclusions never contemplated by an employee (or employer)." They relied on the board's findings that McMullen had no expectation of being able to include cash-ins as part of his compensation for retirement purposes and that before the legislature's 1977 amendment McMullen would not have been eligible to cash in his accrued leave, much less to include it as part of his compensation when calculating his retirement benefits. They therefore concluded that McMullen had no right to include the leave he cashed in as part of his compensation.

The remaining two members reluctantly disagreed. These members believed that *Flisock* "compel[led] the Board to afford Mr. McMullen the opportunity to claim cashed-in-leave . . . as PERS compensation."

After noting that the board was split, the board stated that under AS 39.35.047(c), the effect of a split decision was to affirm the decision of the administrator. As a result, the board ruled that its tie vote affirmed the administrator's decision to refuse to allow McMullen to include his cashed-in leave when calculating his compensation.

McMullen appealed to the superior court. The court affirmed the board's decision. The court reasoned that the relevant issue was whether "leave cash-ins were allowed *for McMullen* prior to the 1977 amendment." The court ruled that the board's finding that McMullen had no right to cash in leave before the 1977 amendment was sufficiently supported by the evidence. The court also concluded that the record supported the board's finding that although McMullen believed that he might in the future be eligible to cash-in leave, "he never linked the opportunity to obtain leave cash-in rights with the inclusion into PERS compensation figures." The court held that these findings were sufficient to support the board's ruling that the administrator had no obligation to include McMullen's cashed-in leave as part of his compensation.

McMullen appeals. He argues that because the superior court never vacated the board's first decision, the board's second decision affirms its first decision (ruling in McMullen's favor) rather than the administrator's decision (ruling against McMullen). Second, he argues that he "has a constitutionally vested right in the application of the statute in place at the time he first enrolled in PERS." Finally, he claims that principles of statutory interpretation require that his accrued unused leave be included in the calculation of his retirement benefits.[4]

## III. DISCUSSION

### A. Standard of Review

█ This appeal involves review of a superior court's affirmance of an agency decision.

---

3. The fifth member of the board did not participate due to a conflict.

4. McMullen also argued in his appellate brief that "three of the four questions posed to the Board on remand were irrelevant to a determi-

nation of whether McMullen's unused accrued leave should be included in his compensation." Because a resolution of this issue in McMullen's favor would not affect the outcome of this case, we decline to consider it.

"When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review and directly scrutinize the merits of the board's decision."[5]

■ McMullen appeals the agency's interpretation of article XII, section 7 of the Alaska Constitution and of the statutes governing retirement benefits. This court applies its independent judgment when reviewing constitutional questions.[6] Where, as here, a statutory question does not involve agency expertise, we review the agency's ruling under the independent judgment standard.[7] In exercising our independent judgment, we must adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[8]

■ McMullen's appeal also requires us to review the board's resolution of the underlying facts. We review an agency's factual determinations to ensure that they are supported by substantial evidence.[9] "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]

### B. The Board's Tie Vote

■ McMullen's first argument is that the board incorrectly concluded that its tie vote affirmed the administrator's original decision. He argues that the effect of the board's tie vote is not to affirm the administrator's original decision against him, but rather to affirm the board's first decision—reviewing the administrator's decision—which reversed the administrator and ruled in McMullen's favor.

McMullen did not raise this point before the board, argue it before the superior court, or list it in his points on appeal. The administrator argues that McMullen has therefore waived this argument.

■ Ordinarily "this court will not consider an issue raised for the first time on appeal."[11] The only exception is where the issue is "1) not dependent on any new or controverted facts; 2) closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings."[12]

Although McMullen's argument is not dependent on any new or controverted facts, it is not closely related to the trial court arguments, and it could not have been gleaned from any of the earlier proceedings. As a result, it does not qualify for an exception to the waiver rule. We decline to consider this argument.

### C. McMullen's Right To Have His Benefits Calculated According to the Law in 1969

■ McMullen argues that he has a right to have his benefits determined under the law and practices that were in effect when he was hired. We agree.

■ Under article XII, section 7 of the Alaska Constitution, the state may not impair the benefits a state employee has accrued under the state's employee retirement systems.[13] Our case law establishes that an employee's right to benefits vests upon employment or enrollment in the retirement system rather than upon retirement.[14] An employee's vested benefits arise by statute,

5. *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1231 (Alaska 2003).

6. *Holding v. Municipality of Anchorage,* 63 P.3d 248, 250 (Alaska 2003).

7. *Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

8. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

9. *DeYonge v. NANA/Marriott,* 1 P.3d 90, 94 (Alaska 2000).

10. *Id.* (internal quotation marks omitted).

11. *State v. Northwestern Constr., Inc.,* 741 P.2d 235, 239 (Alaska 1987).

12. *Id.*

13. Article XII, section 7 provides that:

Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.

14. *Flisock v. State, Div. of Ret. & Benefits,* 818 P.2d 640, 643 (Alaska 1991).

from the regulations implementing those statutes, and from the division's practices.[15] Where the state has changed the benefits system after an employee's enrollment in the system, the employee may choose to accept the new system or may opt to keep the benefits in effect at enrollment.[16]

McMullen is therefore entitled, if he chooses, to have his benefits calculated according to the system that was in effect at the time of his enrollment. This system was governed by the statutes in effect at that time, the regulations that were then applicable, and the division's practices as of 1969.

### D. McMullen's Vested Benefits at the Time of His Enrollment in the Retirement System

McMullen maintains that the statutory regime in effect when he was enrolled entitles him to include his cashed-in leave when calculating his benefits. McMullen relies on our opinion in *Flisock v. State, Division of Retirement and Benefits.*

In *Flisock,* we considered a school superintendent's claim that under the Teachers' Retirement System, his cashed-in leave should be included when calculating his retirement benefits notwithstanding the legislature's attempt to prohibit this practice.[17] Flisock argued that the legislature's effort to remove cashed-in leave from the definition of base salary violated his rights under article XII, section 7 of the Alaska Constitution.[18]

The Teachers' Retirement Board had ruled that because Flisock did not accumulate the leave he cashed in until after the statutory change, the change did not impair any benefits he actually had at the amendment's effective date.[19] We rejected the board's approach, noting that we had consistently held that an employee's retirement benefits were controlled by the system as it was when the employee enrolled in the system and not as it was upon his retirement.[20] We therefore concluded that if Flisock had a right when he enrolled in the system to include cashed-in leave as part of his base salary, it was irrelevant whether he accrued the leave he ultimately cashed in before or after the statutory changes.[21]

To determine whether Flisock ever had such a right, we looked to the statute in effect at the time of his enrollment and to the agency's practices.[22] We observed that under the TRS retirement statute, a member was entitled at retirement to "a monthly benefit equal to 'two percent of the member's average base salary during any three school years of membership service times the years of credited service, including credited fractional years, divided by 12.' "[23] At the time of Flisock's enrollment, "base salary" was defined as

any remuneration accrued under a contract to a teacher for professional services rendered during any school year; for purposes of sec. 50 of this chapter, base salary accrued includes any payments made after June 30 of a school year for services rendered before the end of the school year.[24]

We noted that the statute nowhere excluded payments for cashed-in leave.[25]

We next looked to the practice concerning cashed-in leave in 1969. We remarked that the state had "offered no evidence that the division's practice in 1969 was to exclude payments for unused leave," and we observed that there was some evidence that in 1969 cashed-in leave was used when calculat-

15. *See id.* at 644; *Sheffield v. Alaska Pub. Employees' Ass'n,* 732 P.2d 1083, 1087 (Alaska 1987).

16. *Hammond v. Hoffbeck,* 627 P.2d 1052, 1059 (Alaska 1981).

17. *Flisock,* 818 P.2d at 643.

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.*

22. *Id.* at 643–44.

23. *Id.* at 642.

24. Ch. 84, § 15, SLA 1969, *quoted in Flisock,* 818 P.2d at 643.

25. *Flisock,* 818 P.2d at 644.

ing base compensation.[26] We therefore held that Flisock was entitled to use cashed-in leave when calculating his compensation.[27]

McMullen argues that under *Flisock,* he, too, is entitled to include his cashed-in leave when calculating his benefits. He reasons that, like the operative statute in *Flisock,* the relevant statute here did not exclude cash-ins from the definition of "compensation" in 1969.

McMullen is correct that cashed-in leave was not excluded from the definition of compensation at the time of his enrollment in the retirement system. When McMullen began his employment with the state, compensation for purposes of the system was defined as:

> the total remuneration paid to an employee by the employers for personal services rendered during the period considered as credited service, including cost-of-living adjustments or differentials and including monetary value, as determined by the board, of subsistence and maintenance provided by the employers in partial payment for services, but excluding retirement and other welfare benefits financed by the employers.[28]

But the bare fact that the statute did not expressly exclude cashed-in leave from the definition of compensation is not enough to support McMullen's argument. As already noted above, our decision in *Flisock* relied on two factors: (1) the division's failure to offer evidence that it excluded payments for unused leave; and (2) the presence of some evidence establishing that cashed-in leave had actually been counted. *Flisock* thus stands for the proposition that, under the employer's originally established practices, the employee must actually have been entitled to the benefit that the state's subsequent action allegedly diminished. As a result, McMullen must show not only that the original statute did not exclude cashed-in leave from the definition of compensation, but also that, like Flisock, under the law or policies that originally applied to him, he actually was entitled to cash in accrued leave.

The board found that McMullen never actually had such a right. Our careful review of the record reveals that substantial evidence supports the board's factual findings.

The board found that in 1976 and 1977 two collective bargaining units negotiated agreements that included the right for their members to cash in leave. The board found that McMullen was not in the category of employees who were entitled to cash in leave under these collective bargaining agreements. The record supports these findings. The record shows that in 1969, state employees were not permitted to cash in accrued leave while they were still employed. Documents in the record reveal that the Supervisory Unit employees and the General Government Unit employees later negotiated the right to cash in accrued leave and that these rights became effective in 1976 and 1977. McMullen acknowledged that he was not a member of either of these units.

McMullen maintained at the board hearing that the Department of Administration allowed some employees to cash in leave even if they were not covered by the collective bargaining agreements. But though McMullen argues to the contrary in his brief, he conceded at the board hearing that he was not among those employees.

The board also found that in 1977 the legislature amended the definition of compensation to exclude cashed-in leave.[29] Between the time when the collective bargaining agreements became effective and the legislature amended the definition of compensation, the Department of Administration's director of retirement and director of finance disagreed about whether the leave cash-ins counted as compensation. The attorney general's office issued a memo supporting the finance director's position that leave cash-ins were compensation. The timing of the legislature's action suggests that it was motivated by a desire to prohibit the use of cash-ins to inflate an employee's retirement benefits.

26. *Id.*

27. *Id.*

28. Former AS 39.35.680(4) (effective until June 30, 1977).

29. Ch. 128, § 54, SLA 1977.

Not only did the board find that the "availability of leave cash-in was nonexistent" for McMullen at all times before the legislature amended the definition of compensation, the board also found that McMullen did not have any reasonable expectation that he would be able to include cashed-in leave when calculating his retirement benefits. McMullen stated at the hearing that during the collective bargaining negotiations in 1976, he considered the possibility that he might one day become eligible to cash in leave. But he admitted that it never occurred to him that cashed-in leave might be included when calculating retirement benefits. Indeed, he acknowledged that he "didn't think of leave cash-ins as applying to [retirement benefits] until [he] was sent a copy of the *Flisock* decision." *Flisock* was decided in 1991—fourteen years after the legislature amended the law to bar a practice that could conceivably have given McMullen a vested right before then, but only if it had actually extended to him. The record amply supports the board's finding that during the period that preceded the legislature's exclusion of cashed-in leave from the definition of compensation McMullen never acquired a reasonable expectation of being able to include cashed-in leave when calculating his retirement benefits.

The board issued an evenly split decision that had the effect of affirming the administrator's ruling. Because McMullen was not eligible to cash in leave when the legislature amended the definition of compensation and because he could not then have reasonably expected to be able to include cash-ins when calculating retirement benefits, the prevailing board members concluded that McMullen had no right to include his cashed-in leave when his retirement benefits were later calculated. We agree. Before the legislature amended the law in 1977, neither by law nor by practice did McMullen actually acquire a right to have his cashed-in leave included as part of his compensation. He therefore had no right that could have been impaired when the legislature excluded cashed-in leave from the definition of compensation. Accordingly, the division's refusal to allow McMullen to include his cashed-in leave when calculating

his retirement benefits does not violate article XII, section 7 of the Alaska Constitution.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the board's decision that McMullen is not entitled to include his cashed-in leave as part of his compensation for purposes of calculating his retirement benefits.

FABE, Justice, not participating.